THE CHESAPEAKE AND OHIO RAILWAY COMPANY, complainant and appellant,

*v.*

FRANCIS J. SWAYZE, receiver, defendant and respondent.

[Filed November 1st, 1901.]

1. A party who applies to this court for, and obtains the appointment of, a receiver for an insolvent corporation, and the vesting of the title of the assets thereof in such receiver, will not be permitted by this court to take proceedings in a foreign jurisdiction to obtain a prior lien on those assets for his own debt.

2. It is no objection to the exercise by this court of its preventive remedy in such a case that the party is not within its territorial jurisdiction. By bringing suit in this court to subject the assets to its jurisdic-

27

tion the party subjects himself to its jurisdiction, for all purposes, pending the administration of those assets.

On petition of Francis J. Swayze, receiver, for injunction against the Chesapeake and Ohio Railway Company.

On January 2d, 1899, upon a bill filed in this court by the Chesapeake and Ohio Railway Company, a foreign corporation, receivers were appointed for the Atlantic Transportation Company, a New Jersey corporation. Among the assets of the Atlantic Transportation Company were certain sea-going barges used in the transportation of coal between Newport News, in Virginia, and eastern ports. At the time of the appointment of the receivers, four of these vessels, including the "West Virginia" and "Woodside," were actually at Newport News and had been attached there on December 31st, 1898, at the suit of the Knickerbocker Steam Towage Company. The "West Virginia" and "Woodside" were subject to a mortgage, given some time prior to the attachment, to the Western National Bank of New York.

Upon the day the receivers were appointed in this court, the Atlantic Transportation Company conveyed by a bill of sale all of the vessels, including the "West Virginia" and "Woodside," to the receivers, in pursuance of the order of this court.

On January 5th, an ancillary bill was filed by the Chesapeake and Ohio Railway Company in the circuit court of Newport News, setting up the appointment of the receivers in New Jersey and praying that they be appointed receivers in Virginia. On the same day the circuit court of Newport News appointed the New Jersey receivers, receivers in Virginia. The order appointing them recited that the appointment was made "in support of and ancillary to the appointment by the court of chancery of New Jersey." The order further directed that the officer having possession of the vessels under the attachment should deliver them to the receivers upon the execution of a bond conditioned to indemnify the plaintiff in attachment from loss or damage caused by the transfer of the vessels to the receivers.

On January 6th, the receivers gave such a bond and the vessels

were released by the officer. In pursuance of an order of this court, the receivers continued the business of the insolvent corporation, using for that purpose the vessels in question.

On May 22d, the chancellor restrained the receivers from removing certain vessels, including the "West Virginia" and "Woodside," except to some place within the jurisdiction of the court of chancery. The "West Virginia" was then at Providence, Rhode Island, and the "Woodside" was at New York City.

On May 25th, the circuit court of Newport News, upon the petition of the receivers, directed that they deliver possession of the vessels to the sergeant of the court, to be by him held by virtue of the attachment of December 31st, 1898, in favor of the Knickerbocker Steam Towage Company. The order directed that the transfer was to be without prejudice to the rights of the Towage Company upon the bond given by the receivers on January 6th.

On June 12th, the chancellor vacated the injunction of May 22d, and on June 13th he directed that the Western National Bank, the mortgagees, might apply to the proper tribunal in Virginia, to take possession of the vessels, with or without notice to the receivers, and ordered the receivers to facilitate, in every reasonable and proper manner, the granting of the application.

On July 3d, a petition was filed by the Knickerbocker Steam Towage Company for the removal of the receivers in New Jersey. Pending this application, on August 26th, the Chesapeake and Ohio Railway Company filed a bill in equity in the circuit court of Newport News, alleging that the mortgage of the Western National Bank was invalid as to indebtedness held by the railway company, and praying that the railway company might have judgment for the indebtedness and an attachment against the vessels, including the "West Virginia" and "Woodside," to secure its claims. On the same day the vessels were attached in the last-mentioned suit.

On September 2d, an amended bill was filed in the receivership suit in Virginia originally begun on January 5th by the Chesapeake and Ohio Railway Company, charging that the

mortgage of the Western National Bank on the "West Virginia" and "Woodside" had never been recorded in pursuance of law and was invalid as to all creditors of the Atlantic Transportation Company who had no actual notice of the same. The amended bill set up an indebtedness of the Atlantic Transportation Company to the Chesapeake and Ohio Coal Agency Company; the assignment of that indebtedness to the Chesapeake and Ohio Railway Company, and that the Chesapeake and Ohio Coal Agency Company had no actual notice of the mortgage until after the affairs of the Atlantic Transportation Company were put in the hands of receivers. The amended bill prayed that judgment be awarded to the complainant for its indebtedness and that the mortgage debt be declared invalid as to said indebtedness.

On September 12th, 1889, the receivers in New Jersey resigned, and Francis J. Swayze was appointed receiver, the former receivers being directed to transfer to him all assets, which they accordingly did by bill of sale dated on that day.

On September 23d, the former receivers resigned as receivers in Virginia, and Swayze applied to be appointed ancillary receiver there. This application was denied by the Virginia court, which refused to appoint any receiver.

On September 28th, Swayze, as receiver, filed a petition in this court, in the receivership suit, for an injunction, setting up the proceedings in the case, and charging that the "West Virginia" and "Woodside" were in the possession of the former receivers prior to the Virginia attachments of the Chesapeake and Ohio Railway Company of August 26th; that the vessels were returned by the receivers to Virginia from northern waters solely for the purpose of enabling the former receivers to discharge themselves from liability on the bond to the Knickerbocker Steam Towage Company; that the attachments of the Chesapeake and Ohio Railway Company in Virginia were levied after the appointment of receivers and after the title to the property had vested in the receivers and were an unwarranted interference of the Chesapeake and Ohio Railway Company with the powers of the receivers, and embarrassed the petitioner in the execution

of his duties. The petition charged that the vessels were depreciating and being destroyed; that maritime liens were accumulating and that the interest of all parties required that the receiver should have speedy possession and hold and dispose of the vessels under the order of the court of chancery. The prayer was for an injunction restraining the Chesapeake and Ohio Railway Company from proceeding with the Virginia suits; from setting up any lien by virtue of their attachments, or otherwise, and for an order requiring them to release the vessels from any lien they might have acquired, and to cause the same to be delivered up to the New Jersey receiver.

The answer of the complainant, the Chesapeake and Ohio Railway Company, to this petition admits the facts as therein stated and admits that the vessels are deteriorating in value, but insists that they should be sold by order of the Virginia court. It expressly denies the jurisdiction of the court of chancery to make the order prayed for.

PITNEY, V. C. (orally).

My view of this case has been very briefly and accurately stated by the receiver in his argument. The receiver has no partisan views in this case, except to get the property for the benefit of the creditors. He is a *quasi* judge in the matter, and the court always listens to his views, because they should be impartial; and I mention that not because I adopt his views on that ground, but because they were judicious, and struck me as such as he was stating them.

The case stands in this wise: The Atlantic Transportation Company, on the 2d day of January, 1899, was possessed of a number of sea-going vessels; some of them were barges which were towed, but they were sea-going vessels as I understand it; there is no dispute about that. The business of the Atlantic Transportation Company, as shown by the papers, was that of transporting coal from the terminus of the Chesapeake and Ohio railroad, at Newport News, near Fort Monroe, Virginia, to different ports to the north and east of that port; and two of the

vessels happened, at the date named, to be in Virginia waters. They went there in the regular course of business. So far as appears they had no *situs* whatever in the State of Virginia, any more than any other vessel that was trading at one of the ports of Virginia had a *situs* there. On the contrary, the indications are, although there is no specific direct proof to that effect, that their *situs,* or home port, or place of registry, was either in New Jersey or in New York. The two vessels were, prior to January 2d, 1899, seized at Newport News by an attachment, issued at the instance of a creditor of the Atlantic Transportation Company, the Knickerbocker Steam Towage Company. It had issued an attachment for a debt against the Atlantic Transportation Company and seized those two vessels, and they were in the hands of the sergeant of Newport News, an officer of that Virginia court.

On the 2d of January, 1899, the Chesapeake and Ohio Railway Company, a corporation of the State of Virginia, I believe, filed its bill in the court of chancery of New Jersey, praying the appointment of a receiver of the Atlantic Transportation Company, on the ground that it was insolvent. Two gentlemen, named by the Chesapeake and Ohio Railway Company, were appointed receivers—General Meaney and Mr. Ingalls, a son of the president of the Chesapeake and Ohio Railway Company. The Atlantic Transportation Company, by a proper bill of sale, immediately made a deed of those two vessels, with others, to the receivers, whereby their title, in my judgment, was perfected, and did not require the aid of any court of any other state to perfect it; precisely as if the ships had been lying at a dock here in New Jersey. But such title was subject to the attachment in Virginia, and of course the receivers could not get the possession of the vessels from the sergeant, or marshal, the officer of the court, who had possession of them, without taking some proceeding. It was thought proper, therefore, that the receivers so appointed should be appointed ancillary receivers by the Virginia court. There may have been other assets in the shape of rights and credits in Virginia—I know nothing of that—there may have been many

Chesapeake and Ohio Ry. Co. *v.* Swayze.

reasons why they should have been appointed ancillary receivers in Virginia, besides the peculiar situation of these two vessels; because to reach rights and credits which had a *situs* in Virginia it was necessary to have ancillary receivers appointed there. The Chesapeake and Ohio Railway Company filed a bill in a Virginia court January 5th, 1899, of the same general character as that previously filed in this court, and upon its application the same gentlemen were appointed by that court ancillary receivers, and by the order of appointment they were declared to be mere assistants to the receivership in New Jersey where the corporation belonged.

Subsequently the receivers obtained an order of this court to continue the business of the Atlantic Transportation Company, and to carry it on precisely as if there had been no receivership, and for that purpose they desired the possession of these two vessels, and in order to get them from the sergeant who had them in possession, and for that purpose only, they gave a bond to the plaintiff in that attachment suit, or to somebody, to answer for those vessels, and took possession of them and brought them from Virginia and had them in New Jersey waters, and used them as if they had never been attached.

Now, in my judgment, their title to those vessels arose primarily and principally and, I may say, entirely, out of the fact that they were appointed receivers by the State of New Jersey, and got a bill of sale from the insolvent debtor. The only aid to their title which arose out of the ancillary receivership was simply to enable them to get the bare possession of the vessels, but did not strengthen their title a particle, for the reason— and I repeat it—that there did not appear to have been any *situs* in Virginia, except the incidental one of their being attached there, as they were lying in the public waters of the United States, in the limits of the State of Virginia.

Now in that state of things the business of the corporation was continued, and it turned out that there was a claim advanced by the Western National Bank that it held a mortgage, registered in the city of New York, upon these and other vessels; and the United States Trust Company held some mortgages, and the

chancellor, on the application of these receivers and of the credi-
tors who held the mortgages, made an order substantially that
the vessels should be delivered up to the mortgagees upon pay-
ment of some trifling sum, or no sum—I forget how that was.

Mr. Corbin—Finally no sum.

The Court—Finally no sum; but the difficulty was that if
the receivers delivered up to the mortgagees those two vessels
that had been subject to the Virginia attachment they might be
liable on their bond that they had given in the attachment suit
in Virginia to get possession of them. Therefore the chancellor
ordered that they might and should, in case of their bond, and
to relieve them from its effect if possible, re-deliver those vessels
to the sergeant in Virginia, and they did so. At the same time
they got an order of the Virginia court which states distinctly
on its face that they were delivered to that sergeant simply for
the purpose of that attachment. It was no relinquishment of
title whatever, except, it may be, between them and the mort-
gagees. As between them and the mortgagees, it having been
done in pursuance of the order of the chancellor for that pur-
pose, it may hereafter be claimed by the mortgagees that that
delivery was for their benefit; but for present purposes I will
put the mortgagees out of view. And if you put the mortgagees
out of view then that delivery did not at all affect the receivers'
title. It simply helped them as a defence to any action of the
bond they had given to get possession.

Things remained in that shape until the 26th of August,
when the Chesapeake and Ohio Railway Company, the com-
plainant in this suit, filed an attachment bill in the Virginia
court, on the equity side, attaching these ships, on a claim of
debt that they held against the Atlantic Transportation Com-
pany.

Now, right here, that conduct was entirely contrary to first
principles, in my judgment. They had no right to do it. It was
a contempt of this court. It was flying in the face of this court.
They had come here and asked this court to appoint receivers
to take these vessels and administer them for the equal benefit
of all creditors, and they turn around in the face of that and

attempt to get a lien for their own individual benefit.  Now I repeat, that conduct was contrary to fundamental principles on which the courts deal with such cases.  So held by all the authorities.  Mr. McCarter handed me up the other day a list of cases on the subject, and among them is the one in Vermont, decided by Chancellor Royce (*Vermont and Canada Railroad Co. v. Vermont Central Railroad Co. et al., 46 Vt. 792*), which contains a very able and complete review of all the authorities, citing some in various states and in England; and there is also the Rhode Island case (*Chafee v. Quidnick, 13 R. I. 442*). I shall not go into them, except to merely refer to the Vermont case, which is so exhaustive that it really leaves nothing to be desired in the way of discussion.  The bringing of that action by the Chesapeake and Ohio Railway Company was a contempt of this court, in my judgment; and if this proceeding were one to adjudge the Chesapeake and Ohio Railway Company in contempt I should do it.

Then the mortgagees, the Western National Bank, filed a petition in this court for leave to take possession, I believe, and for an injunction against the Chesapeake and Ohio Railway Company.

Mr. McCarter—That petition was only for an injunction.

The Court—Oh, yes.  But after you had filed a petition for leave to take possession the Chesapeake and Ohio Railway Company filed an amendment to the original insolvency bill filed on the 5th of January in the Virginia court; and in that amendment they set up that the mortgage of the Western National Bank is void, without, as I understand, stating on what ground it is void.  Then by that bill they pray that it may be declared void, and in effect pray that they may have the proceeds of the sale of those vessels for their own benefit.  It is now said by counsel that that amendment has been amended, so that the bill is filed for the benefit of all of the creditors.  And they say they have jurisdiction of those vessels because they are in Virginia waters, as against the mortgagees, the Western National Bank; which compels the Western National Bank to go down there and litigate that question.

Now I very much doubt whether they have any such possession as will give them such jurisdiction, and it is very desirable that that question should be raised where the court will have undoubted jurisdiction. As I understand, the Western National Bank has declined to accede to that jurisdiction; has not appeared in that court. I don't know whether it is made a party or not, or whether process has been issued against it, or whether there has been any publication or anything of that kind.

Mr. Swayze—I think there is an order of publication or something like that, but I am not sure; there is no process—no appearance.

The Court—In the meantime the two receivers who had acted in this case (and the evidence before the court shows that they were acting all the time entirely in the interest of the Chesapeake and Ohio Railway Company, I am justified in saying that), were proceeded against for their removal, and when the order to show cause why they should not be removed came on for argument they resigned, without waiting for an inquiry into the merits, and promised to resign as ancillary receivers in Virginia, and did do so, and were relieved by both courts. The court of chancery of New Jersey then appointed Mr. Swayze, the present receiver, in their place. In the meantime, however, Mr. McCarter, on behalf of the Western National Bank, had filed a petition for an injunction against the Chesapeake and Ohio Railway Company to restrain them from proceeding with those suits in Virginia. When the new receiver was appointed he came in and took the case up himself, and filed a petition on his own account, which the Chesapeake and Ohio Railway Company have answered under protest, denying the jurisdiction of this court; and the matter is now before me on that petition.

I shall not at present take any notice of, or deal with, Mr. McCarter's petition on behalf of the Western National Bank. The question now is whether the court of chancery can permit the Chesapeake and Ohio Railway Company to do anything whatever to prevent the receiver it has appointed from getting possession of these vessels; and I am decidedly of the opinion,

notwithstanding the very able argument that has been made by Mr. Corbin, for which I am certainly very much obliged— I am decidedly of the opinion that this court should take prompt and thorough action as far as it can to prevent that proceeding on the part of the Chesapeake and Ohio Railway Company. The only ground on which I can see that the Virginia court can hold these vessels, with any kind of respect for propriety in judicial proceeding, is on behalf of the Knickerbocker Steam Towage Company. Now it was stated here by respectable counsel from Virginia that he, on behalf of that steam towage company, had given a consent to the sergeant or marshal to let these vessels go; that there was no reason, so far as the steam towage company went, why the marshal should not be.permitted to deliver possession of them. And that being so, the only thing in the way of the receiver getting possession is the.action of the Chesapeake and Ohio Railway Company.

The question of jurisdiction of the Virginia court does not arise here, because, whatever jurisdiction it may have, it can exercise only at the suit of somebody. There must be somebody there asking for its exercise, and the only person asking for it, so far as this court at this time perceives, is the Chesapeake and Ohio Railway Company; and this court will forbid the Chesapeake and Ohio Railway Company to ask the Virginia court to retain those boats.

Of course the receiver has to deal as best he may with the steam towage company, the original plaintiffs in attachment there. That we have nothing to say about. The Chesapeake and Ohio Railway Company is not responsible for that.

Objection is made to any action by this court against the Chesapeake and Ohio Railway Company on the ground that it has no jurisdiction of that company. I think the objection is without merit. The very point is covered by the Rhode Island case above cited. There a distinguished counsel from New York and a distinguished counsel from Boston united in making application, as counsel merely, in favor of a client, to the Rhode Island court to appoint a receiver of an insolvent company, and after such receiver was appointed on their application one of

the gentlemen assigned to the other his claim against the insolvent company for services, and the assignee issued an attachment in New York and levied upon certain funds belonging to the insolvent company in the hands of a merchant there. The matter being brought to the attention of the Rhode Island court it adjudged that counsel in contempt, on the ground that though not within the jurisdiction of the court, he had, by merely acting as counsel, and not as solicitor or attorney, for the plaintiff, submitted himself to the jurisdiction of the court. That case goes much farther than the present.

But there is another line of cases in the federal courts which I think is of significance here. It is a settled rule in those courts that if a party comes from one circuit into another circuit and brings an action there, and appears only for the purpose of bringing that action, the defendant in that action may file a bill on the equity side as a defence to that action, and acquire jurisdiction of the person by service upon his solicitor, or service out of the jurisdiction, which he could not otherwise acquire. I will give you an illustration of it. One, Trotter, who lived in Brooklyn, New York, brought an action of trespass in the United States circuit court for the district of New Jersey, against the old New Jersey Zinc Company, based upon the title to a strip of land in the zinc district in Sussex county. He obtained a large verdict before Judge Nixon, sitting in the circuit court; and after the refusal of a new trial, I was brought in as counsel by the zinc company. The plaintiff's title rested upon a mistake—as the defendants alleged—in the description of a deed; and I filed a bill in equity, on behalf of the zinc company, in the circuit court of the United States for the eastern district of New York, to reform that deed and to stay the execution on the judgment. I obtained a preliminary injunction or order, *ex parte,* from Judge Benedict in the United States circuit court. The judge went abroad, and the order to show cause, answer, &c., came on before Judge Blatchford. I had supposed that I must, of necessity, go into the district where Trotter lived, and that I could not get jurisdiction of him in the New Jersey district; but Judge Blatchford, without going

into the merits, dismissed my bill by a short opinion that never was published, in which he pointed out the decisions in the United States circuit court to the effect that in such a case the federal court of New Jersey had jurisdiction, and that the appearance of Mr. Trotter there in his action compelled him to submit to the jurisdiction of that court by a service on his solicitor, without service on him within the jurisdiction, as to all matters arising out of or pertaining to the subject-matter of the suit brought there by him. On the same bill and affidavits I immediately applied to Judge Nixon in the New Jersey district, and obtained an injunction. In the present case the proposed action against the Chesapeake and Ohio Railway Company pertains to the subject-matter of its suit in this court.

Another objection made is that the vessels should be kept within the jurisdiction of the Virginia court because the receivers gave bond in that court as such, and may be liable to prosecution there in respect to their possession of the vessels. I think there is nothing in that objection. Those receivers, by the order of this court, and also by the order of the Virginia court, delivered those vessels to the marshal or sergeant, and afterwards by the order of this court conveyed them to the new receiver. They have been discharged from further duty as receivers, by both courts, and I am unable to imagine that they can be charged, as ancillary receivers, with any breach of their bonds given in the Virginia court. But if such a breach should be averred, it seems to me that this court has complete power to protect them in the premises.

I will advise an order, made as strong and as searching as counsel can draw it, forbidding and restraining the Chesapeake and Ohio Railway Company from doing anything in any suit, or taking any measures whatever, either directly or indirectly, to prevent the receiver, Mr. Swayze, from taking possession of those vessels. I don't see that I can go any further to-day.

After an order made in pursuance of the foregoing opinion, Mr. Corbin, on behalf of the Chesapeake and Ohio Railway Company, asked for a stay of the order pending an appeal, which the vice-chancellor declined, saying:

Chesapeake and Ohio Ry. Co. *v.* Swayze.

It seems to me that it comes out just where I stated before you proceeded with your argument, that the preservation of the *status quo,* so far as regards the rights of all parties—and that is the thing to look at—will be preserved; the *status quo* will be preserved by letting the receiver have those vessels and selling them and turning them into money, to prevent them from deteriorating by the action of the water. I believe it was stated by you, or admitted by your answer yesterday, that those vessels are deteriorating in value all the time.

Mr. Corbin—They ought to be sold, there is no doubt about that.

The Court—If so, what better could be done to preserve the rights of everybody, the *status quo*—to use, I suppose, the subtance of the language of the late chief-justice in his opinion which has caused so much criticism—what could be done better than to sell those vessels and impound the proceeds? Here is the subject-matter—the proceeds of the sale of the vessels. This court gets the money proceeds here in the hands of its receiver. The court of errors and appeals decides that it ought to go to somebody down in Virginia—to a new receiver to be appointed there. This court will obey the order of the court of errors and appeals, and send the money back to Virginia. The thing is preserved. The right of the Virginia court is also preserved. Because if it appears that the Chesapeake and Ohio Railway Company has a right to prosecute that suit in Virginia—as soon as the court of errors and appeals so decides—this receiver is ordered to return the fund and the court of errors and appeals will direct the court of chancery to restore the *corpus* to the Virginia courts.

I think it eminently a case where the whole spirit of the law, which has been exemplified in New Jersey by the National Docks case, and which has been attempted to be—I desire to compliment the gentleman on his draft of that act—has been attempted to be put in writing, but which is beyond the power of mortal man to do, precisely as it is beyond the power of mortal man to codify the laws of any progressive country—requires that the order I have advised should be executed by bringing the property

Chesapeake and Ohio Ry. Co. v. Swayze.

in question into this state and turning it into money. And what have we got here? The subject-matter of dispute is two vessels, two sea-going barges, and the question is who is to dispose of those barges—the courts of New Jersey or the courts of·Virginia? It is admitted on all hands that the barges should be taken care of by being sold and turned into money. This court is of the opinion that it is the business of this court to do it, and not the business of the Virginia courts. This court so decides, and in the meantime let the barges be sold, and if the money is in the hands of this court, and the court of errors and appeals shall be of opinion that this court is wrong, the money will be returned. The subject-matter will be there—saved—and preserved as thoroughly as it possibly can be. Now that is the situation. And for these reasons I decline to stay the operation of the order in any way pending the appeal.

*Mr. Charles L. Corbin,* for the appellant.

*Mr. Edward M. Colie,* for the respondent.

PER CURIAM.

The decree appealed from is affirmed, for the reasons given by Vice-Chancellor Pitney in the opinion below for advising it.

COLLINS, J. (dissenting).

It cannot be successfully gainsaid that any Virginia creditor of the defendant, who had not voluntarily submitted to the jurisdiction of the New Jersey court of chancery in the insolvency proceeding, might properly have taken the action in the Virginia court that is reprobated by the learned vice-chancellor because taken by the complainant in that proceeding. The vessels attached were solely within the Virginia jurisdiction. They were so at the time the bill in insolvency was filed here, and for that reason, and for that reason only, an ancillary bill and receivership became necessary there. They never left that jurisdiction except *in custodia legis,* and at the time of the attachment in equity their original *status* had been restored by procedure ac-

quiesced in by the New Jersey court of chancery. True, the title of the defendant as mortgagor had passed to the principal receivers, but possession had not been obtained and the New Jersey court had no jurisdiction or means of compelling jurisdiction over the mortgagees. Had the ancillary receivers obtained possession of the vessels, they could not have transferred jurisdiction over them to the principal receivers. *Reynolds* v. *Stockton, Receiver, 16 Stew. Eq. 211; 140 U. S. 254.* That the same persons were both principal and ancillary receivers is an immaterial circumstance. That the receivers have resigned in both jurisdictions and that only in New Jersey has a successor as yet been appointed is unimportant. The Virginia court must, on application, make an appointment. The case shows that there are Virginia creditors. The Virginia court has the right to administer the assets in Virginia, not to give those creditors an undue share, but to give them their proper share in that state. Our court of chancery has very properly insisted on like right where the situation is reversed. *Irwin* v. *Granite State Provident Association, 11 Dick. Ch. Rep. 244.* We should accord the same respect that we exact. The New Jersey receiver, if need be, will be heard in the Virginia court. A Virginia creditor cannot be driven from the home court, and in no other court is jurisdiction to attack the mortgages possible to any creditor unless service upon the mortgagees can be secured. But the learned vice-chancellor thinks that the complainant, although a Virginia corporation, is estopped from seeking a remedy open to others because it had invoked the New Jersey jurisdiction in insolvency. It is difficult for me to see why this should be so. The scope of the bill was an adjudication of insolvency. The results of such a proceeding are entirely statutory. The complainant sought and could seek no individual relief. Its *status* would depend on proof of its claim before the receivers, not on the filing of the bill. But waiving this and waiving also the fact that in the impugned proceeding in Virginia the complainant was the assignee of a stranger to the New Jersey record, I am convinced that its course was unexceptionable. It desired to attack certain mortgages claimed as liens upon the vessels in question. Its contention was that by reason of non-registry

these mortgages were void as against creditors not having notice thereof, and it alleged that its assignor was such a creditor. It would have been perfectly proper to seek the relief which such conditions justified in any tribunal that could give it. There would have been nothing inconsistent in seeking it in the New Jersey suit itself or in one collateral thereto, brought for proper administration of assets. But the New Jersey court had jurisdiction neither over the vessels nor the mortgagees. Consequently the complainant followed the property, and, in the same court that was administering relief ancillary to the New Jersey jurisdiction, made its plaint. That was no contempt of the New Jersey court, but rather was it deferential to its supremacy. The course of procedure was this: first, a bill was framed against the defendant and the mortgagees, referring in terms to the original insolvency bill in New Jersey and to the ancillary bill in the same court in which the new bill was then exhibited, and to the receivership, setting up the ground of alleged invalidity of the mortgages and praying enforcement of complainant's debt against the vessels. Upon this bill there was issued an attachment in equity the effect of which was to hold the vessels against removal, and on the next rule day the bill was duly filed according to the practice of the court. Meantime the complainant had amended the ancillary bill referred to by inserting like allegation and by bringing in the mortgagees as parties defendant and praying relief against their mortgages. It is said that in its separate bill and in the amendment the complainant asks relief for itself alone; but this criticism is captious. As to the amendment it appears that the bill amended was originally filed in behalf not only of the complainant, but of all other creditors. The independent bill was doubtless supererogatory and in any case is not to be condemned because of its limited prayer. *Non constat* that there are other creditors in the same situation as the complainant. If there are any such they can readily be heard. If there is a lack of parties to either bill by reason of the absence of a receiver to represent the general creditors, that is a defect to be remedied upon complaint to the tribunal whose jurisdiction is invoked.

Remembering that the Virginia court is a court of equity and that all the facts have been ingenuously disclosed to it, we must assume that equity will be administered. Only by comity between the courts of general jurisdiction of the sister states can the harmonious working of our union be secured. The dissentients in this case are content to leave to the Virginia court the due administration of right and justice and therefore vote to reverse the order from which this appeal was taken. That order directs that the complainant must release its attachment and execute and deliver any papers necessary to enable the new receiver, appointed only in New Jersey, to obtain possession of the attached vessels, and must facilitate by every means in its power the acquiring possession of the vessels by such receiver. The saving clause that nothing in the order shall prevent the complainant from prosecuting its suit in the Virginia court to set aside the mortgages, provided it can do so without interfering with the New Jersey receiver's paramount and unrestricted right of possession and his immediate actual possession and right of removal of the vessels from the State of Virginia, is an idle form. Jurisdiction in Virginia exists only by reason of the presence of the vessels there. The mortgagees are non-resident and only through the *res* can they be reached.

I have put the case on a broad ground, but it should be added that there is a fact that in any view should relieve the complainant from censure even had it been seeking individual relief in an independent forum. Before the complainant took action, now reprehended, the court of chancery, under a petition on which the complainant was not heard, had, by order, directed the receivers to surrender to the mortgagees their title to these vessels.

*For affirmance*—DEPUE, VAN SYCKEL, LIPPINCOTT, GUMMERE, LUDLOW, NIXON, ADAMS—7.

*For reversal*—THE CHIEF-JUSTICE, DIXON, GARRISON, COLLINS, HENDRICKSON, VREDENBURGH—6.